WILLIAM S. MACOMBER *vs.* STATE BOARD OF HEALTH.

JUNE 15, 1906.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1)  *Physicians and Surgeons.    Unprofessional Conduct.*

Upon an appeal from the decision of the State Board of Health revoking the certificate of a physician upon the ground of "gross unprofessional conduct" and "conduct likely to deceive and defraud the public," in the absence of testimony showing the falsity or extravagance of statements attributed to appellant, the court can not take judicial notice of matters requiring expert medical knowledge.

APPEAL, under provisions of Gen. Laws cap. 165, § 5, from decision of State Board of Health revoking certificate of appellant.    Decision overruled.

PARKHURST, J.    The appellant was notified, by notice dated March 20, 1905, to appear before the state board of health on the 23d day of March, 1905, to show cause why his certificate to practice medicine in the State of Rhode Island should not be revoked, under chapter 165 of the General Laws; and on said 23d day of March said appellant did appear, and the said, board, after hearing evidence for and against the said appellant, on the charges preferred against him by the secretary of the said board, and hearing the arguments of counsel on his behalf, found that the said appellant was guilty of gross unprofessional conduct, and of conduct of a character likely to deceive and

defraud the public, and that in its opinion said appellant was an unfit person to practice medicine in this State, and that the certificate heretofore granted to said appellant to practice medicine in this State was thereby revoked; and so notified the appellant.

From the decision of the said board the said appellant appealed to this court, under chapter 165, section 5 of the General Laws of this State.

A careful examination of the testimony presented to us in this appeal does not, in our opinion, furnish sufficient ground upon which we can support the finding of the State Board of Health that the appellant was guilty of "gross unprofessional conduct," or of "conduct of a character likely to deceive and defraud the public."

A number of advertisements from Providence papers relating to cures or alleged cures said to have been made by use of the "Electricure," a device for which one David S. Frazer was agent in this State, are produced by the State board, upon a few of which appear the name of the appellant as "specialist," or as "physician in charge;" also certain circulars and advertisements purporting to explain the "Electricure" and exploiting in glowing terms its powers in the cure of numerous diseases. It is evidently the intention of the State board that this court shall *infer*, from the language of these various advertisements, that the statements therein contained are untrue, that the claims made are extravagant, and therefore likely to "deceive and defraud the public," and that Dr. Macomber, the appellant, by allowing his name to appear upon some of them or by distributing some of them to his patients or to inquiring parties, has been guilty of conduct as above set forth.

Unfortunately, however, the State board has not seen fit to offer any testimony to show that any one of the statements set forth is untrue in fact, or even that it is extravagant or misleading, or tending to "deceive" or "defraud the public." The evidence is submitted to this court as if the court were a body of medical experts fully qualified to pass upon all the numerous medical questions involved. It is hardly necessary to say that this court disclaims such qualification and can not

take judicial notice of such matters, but is bound to form its judgments in such matters solely upon evidence adduced before it.

Again, with regard to the device known as the "Electricure," about which the State Board of Health seems to desire us to *infer* that it is a deception and a fraud; the board is satisfied to place before us the evidence of a *single* application of this device to a person not shown to have been suffering from any disease, and not shown to be of any expert capacity in the observation or investigation of devices of this character, and desires us to *infer*, from the apparently negative character of this single experiment, that the repeated application of this device, according to the directions given by its inventor, is of no value to the patient, and therefore is a fraud and tends to "deceive and defraud the public." This evidence is purely negative, and does not assist the court in coming to any conclusion regarding the value or want of value of the device in question.

As to the mechanical efficiency of the "Electricure," whether or not it is capable of producing an electric current or "thermal electricity," it would have been very simple to have subjected the device to the examination of well-known electrical experts, under the conditions named in the circulars, and to have shown whether or not in fact any such electrical energy was produced; but the board has not seen fit to do this; the tests applied not having been made by persons qualifying as experts, and such tests as were applied appearing to be only partial and not in accordance with the conditions specified in the directions for use.

The most cogent evidence to show that the appellant had been guilty of "gross unprofessional conduct and of conduct of a character likely to deceive and defraud the public" would have been evidence from some one or more persons that he or they had been actually deceived or defrauded, had been led into expense without adequate benefit, or had been told that they would be cured of any of the various diseases mentioned, and had taken the treatment without results, or with bad results; or that the statements made as to cures actually

effected were in fact untrue. The board has produced no evidence of this character; but on the contrary the appellant has produced seven witnesses of apparent respectability and intelligence, none of whom are in any wise discredited or impeached or contradicted, and all of whom testify to substantial relief or cure of serious disorders or disabilities. Dr. Macomber himself in his testimony shows that he did not in any instance attempt to "deceive" or "defraud" his patients by any extravagant claims, or promises, and that he did not demand pay from them unless they themselves were satisfied with the treatment and its results.

On the whole case, while the board has succeeded in raising some considerable suspicion in our minds as to the matters in question, we are satisfied that the evidence is not sufficient to warrant the revocation of the appellant's certificate, in that it does not show that the appellant was guilty of such conduct as charged.

The decision of the State Board of Health is overruled.

BLODGETT, J., dissenting. I am unable to agree with the conclusion to which my brethren have come, that the evidence does not show "that any one of the statements set forth is untrue in fact or even that it is extravagant or misleading or tending to 'deceive or defraud the public.'"

To my mind the evidence establishes each of these propositions, and I shall therefore indicate, at some length it may be, the undisputed evidence upon which I feel constrained to dissent from the opinion of the majority of the court.

In the first place it is undisputed that the appellant Macomber used the device known as "The Electricure," and that he distributed generally, and gave to the secretary of the State Board of Health, the "Blue Book" ("Exhibit 15") which contains *inter alia* the following statements: "The Electricure . . . Absolutely Cures Consumption, Female Complaints, Paralysis, Rheumatism, Heart Disease, *and all* Acute, Chronic and Organic Diseases, *no matter what their name or origin.*" . . . "It is no faith cure or necromancy, but is the practical application of the greatest discovery—the giving

of oxygen—of this wise age for the cure of all human ills, and all ailments of beasts as well, for the principle affects equally all living kind.    . . .

"Two distinguishing qualities that make it vastly superior to all other means of curing disease and relieving pain, mark its successful work thus far, namely:

" It is safe in its operations, reliable in its effects.

"The effects of the *Electricure* must not be confounded with a battery, dynamo or static electricity nor galvanism, in any form that has ever been given to the public; and its operations are not like any electrical or magnetic device as it is a practical application of a law of thermal electrical action, the result of phenomenæ (sic) gathered in the field of nature, around which no fences are, and he who will may enter and dig—truth—with which to bless mankind; hence in comparison with other devices, founded upon the principles of electrical science that have been given to the public, attention is called to this phenomenæ.    (sic)

"1.   That its electrical currents are sensible on first application to about one person in ten; on the second, to one in one hundred; and on the third, to one in ten hundred;"   . .

it "is operated without assistance whenever water or its equivalent in temperature can be had; altogether it is a marvel of construction, adaptability and convenience; and is the most adequate life agent of the century—having distanced all its eager competitors in the grand race for amelioration of human suffering by the direct application of the greatest forces of the universe—thermal electricity and oxygen, as it kills every microbe in the system.    . . .

"Let no invalid despair or seek the sea, the mountain or a foreign shore in search of health—perchance to die—when it can be surely found at home by the intelligent use of the Electricure, for cures are wrought by it that under the old system of medication are impossible."

These citations are set forth at some length in order that the exact representations made may be precisely stated.

It thus appears that the promise is, not of benefit or of alleviation, but of "absolute cure;" that it is not limited to

certain diseases, but embraces "*all* Acute, Chronic, and Organic Diseases, no matter what their name or origin;" that this promise is not inadvertently made, but is repeated again and again, in substance, though in different forms of expression, including diseases peculiar to animals and from which man is free. That the device does not act by suggestion or through the imagination ("It is no faith cure or necromancy"), but is "the most adequate life agent of the century," for working cures, and that "cures are wrought by it that under the old system of medication are impossible." More comprehensive claims could hardly be made on behalf of the fabled *Elixir Vitæ* of the ancients.

Now it is evident that the representation that this device "absolutely cures . . . all Acute, Chronic and Organic Diseases, no matter what their name or origin" is either true in all respects, untrue in all respects, or true in some cases and untrue in other cases. If therefore this court can not sit as a body of medical experts and assume that such representations are untrue in any respect, without evidence, can the court sit as a body of medical experts and assume that such representations are true in all respects without evidence? The representations are disproved by evidence of a single exception. They are not sustained except by proof in all instances, and surely he must indeed be wise in the science and skilled in the art of healing who will assume the burden of affirmative proof in such a case. Hence it requires an even higher degree of expert knowledge to assume the correctness of such a contention in every case than to deny its correctness in a given instance. But the record is not wanting in testimony that these representations are false. The appellant Macomber himself testifies in his direct examination as follows: "Q. 16. Did it in all cases greatly benefit the patients? Ans. No, not in all cases. Some of the cases that I treated there was no change one way or the other. Those cases, however, were very few." In direct denial of the representations contained in the pamphlet which he distributed to the public, he says: "Q. 26. Do you claim that the electricure will cure all kinds of diseases? *Ans.* I do not and never did." His

testimony on cross-examination further establishes the falsity of these representations, as follows: "C.Q. 136. Do you recollect your testimony in the hearing before the State Board of Health in regard to this matter? Ans. I think I do. C.Q. 137. Do you recollect that you testified before them that you believed the electicure would cure all diseases with the exception of locomotor ataxia? I am asking now as to your recollection. Ans. As to what I believed at that time? C.Q. 138. No; I am not asking that: I am asking you now as to your recollection of what you testified to at that time. Ans. I think I did testify to that effect. C.Q. 139. You did? Ans. Yes. C.Q. 140. Have you changed your mind? Ans. I have. C.Q. 141. To what extent? Ans. Well, I found certain cases that I hadn't been treating but a short time at. that time, that under continued treatment, I am convinced, that they could not be cured by the electricure. . . . C.Q 154. Then I. understand you have changed your belief to that extent since the hearing before the State Board of Health? Ans. Yes; I will name one more that comes in my mind now that I don't think it will cure, that is, cancer. C.Q. 155. Do you still believe that it will cure gall stones? Ans. I don't think I ever testified that it would cure gall stones, that is, that I have said that it cured gall stones. I never saw a case treated for that. C.Q. 156. I am asking you about your belief: Do you still believe that it will cure gall stones? Ans. I have not any belief about that. C.Q. 157. Do you still believe that it will cure stone in the bladder? Ans. No; I don't believe it will. C.Q. 158. Can you tell what caused you to change your belief about its ability to cure stone in the bladder? Ans. My observation with the electricure. C.Q. 159.. Do you believe that it will cure chronic senile dementia? Ans. No. C.Q. 160. Do you still believe that it will benefit it? Ans. Yes; benefit it, benefit the patient. C.Q. 161. Do you believe it will cure consumption? Ans. In some cases, not all. C.Q. 162. What distinction do you make between them? Ans. My observation has been that consumption, in the primary, in the early stages can be cured by it, but in the later stages can't. C.Q. 163. Do you still

believe it will cure diseases of the kidneys? Ans. Some diseases of the kidneys. C.Q. 164. Dropsy? Ans. Yes. C.Q. 165. Pneumonia? Ans. Yes. C.Q. 166. Appendicitis? Ans. Yes. C.Q. 167. Diphtheria? Ans. Yes. C.Q. 168. Organic heart disease? Ans. Well, I don't know; some forms of heart disease under my observation have been benefited by it, but some forms of heart troubles I have not treated or attempted to treat with it. C.Q. 169. The question was: Organic heart diseases? Ans. Some functional troubles of the heart. C.Q. 170. Do you call those organic? Ans. No. C.Q. 171. My question was: Organic? Ans. You are asking me what I believe it will cure? C.Q. 172. Do you still believe it will cure organic heart disease? Ans. No." . . . (p. 88) "Q.121. Do you still claim that the electricure will cure tuberculosis, appendicitis, pneumonia, diphtheria, and so forth, and all the other diseases enumerated in that circular, excepting locomotor ataxia? Ans. Tuberculosis in its early stages; I do not make any claim for it in its other stages. The other diseases named by you are acute diseases,— diphtheria, appendicitis, pneumonia. Q. 122. Do you claim it will cure all acute diseases? Ans. Yes; I do. Q. 123. The chronic diseases you do not claim that it will cure? Ans. Not in all cases; some chronic cases, it will, so far as my observation has led me."

So, too, the evidence is undisputed as to the construction and action of the device, for which the sum of $30 was charged.

The testimony of the chemist for the State Board of Health, Mr. Pratt, is as follows: "Q. 8. Did you make any further test, Mr. Pratt; did you examine the interior of this (referring to the instrument)? Ans. I looked the apparatus over with the idea of studying its inner construction, and saw from the wiring that it was expected by the parties who constructed the machine that the electric current, if such was the virtue of the machine, was to travel in both directions through a solid bar, contrary to the ordinary understanding of electric matters. . . . Q. 10. Is there a composition that could be placed in that instrument like that which would generate electrical energy? Ans. Not to my knowledge, to connect it up in the

way this is, namely, placed in a water solution, simply in a
water solution. . . . Q. 14. As I understand you, then,
with this instrument in water as the directions direct, it is im-
possible to generate electricity? Ans. In my judgment it is."

Nor is the testimony of the secretary of the State Board of
Health, Dr. Swarts, denied. He says: "Q. 22. What test
did you put it to, Doctor? Ans. The first test was to deter-
mine if it had any electrical energy as evinced by the test of
the amperage or voltage, as is customary with electrical tests.
Q. 23. How is that test made? Ans. By placing in the
circuit of the instrument in operation an ampere meter or a
volt meter—one indicating the amount of the current and the
other the amount of the force. Q. 24. What did it show, in
either case? Ans. There was no indication that there was any
current of any kind, or any electro-motive energy of any kind."

The method of treatment prescribed by the directions
("Exhibit 20") for all the diseases which the appellant Macom-
ber still claims can be cured by this device is the same for
appendicitis as for pneumonia, for dropsy as for diphtheria, viz.:
"First soak feet in hot water for six to eight minutes before
taking first treatment." Then "Apply for one hour for five
successive treatments, on No. 4." The "No. 4" is the number
upon the switchboard which, upon examination, appears to be
so constructed and wired that even if electricity were gen-
erated, inasmuch as all the sections are permanently con-
nected, there can be neither increase nor diminution of the
current. Then "Allow one week for reaction and resume as
before, for five treatments, and so continue until cured, save
that ten to fourteen days should be allowed for reaction
between each course after the first period of one week."

Inasmuch as "its electrical currents are sensible on first
application to about one person in ten, on the second to one
in one hundred and on the third to one in ten hundred," it is
not difficult to understand the length of time which must
elapse before the patient first begins to doubt of its efficiency
or abandons the treatment in despair, if, indeed, death does
not meanwhile supervene; or it may be that, by the passage
of time, the *vis medicatrix naturæ* may again establish its

dominion over the disease. Why the vitalizing effect of the treatment diminishes in perceptibility in a ten-fold ratio upon successive applications is not explained.

In view of this record and the language of the statute (Sec. 2, cap. 926, Pub. Laws), which prohibits conduct "*likely* to deceive or defraud the public," and does not require actual proof of such fraud or deception, the finding of the State Board of Health revoking the appellant's license on that ground should be affirmed.

*Cassuis L. Kneeland,* for appellant.

*Henry W. Greenough, Assistant Attorney-General,* for State Board of Health.

